United States District Court
Southern District of Texas
FILED

AUG 17 2023

Nathan Ochsner, Clerk

United States District Court
Southern District of Texas
**ENTERED**
August 17, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

| | | |
|---|---|---|
| YOLANDA MARROQUIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:22-CV-0297 |
| | § | |
| KILOLO KIJAKAZI, Acting | § | |
| Commissioner of the Social Security | § | |
| Administration, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff Yolanda Marroquin seeks judicial review of a final decision by the Acting Commissioner (the "Commissioner") of the Social Security Administration (the "SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). At issue is whether there is substantial evidence to support a determination by the Administrative Law Judge ("ALJ") as to Plaintiff's residual functional capacity ("RFC") for purposes of the fourth step of the SSA's five-step sequential disability evaluation. Plaintiff argues that the ALJ failed to properly evaluate the opinion of her treating physician, Dr. Jhonny Bazan. Plaintiff requests a reversal of the determination and remand to the SSA.

Pending are the parties' cross motions for summary judgment. (Dkt. Nos. 11, 14). The parties have also filed responses to each other's respective motions. (Dkt. Nos. 15, 16). The cross motions are now ripe for consideration.

This case was referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After review of the parties' briefing, the record, and the relevant law, the Magistrate Judge RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. No. 11)

be DENIED, that the Commissioner's Motion for Summary Judgment (Dkt. No. 14) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

## I. SOCIAL SECURITY FRAMEWORK

### A. Five-Step Sequential Evaluation

Social Security is a program whereby the federal government, through the SSA, provides monetary benefits to eligible individuals with disabilities, among others. *United States v. Froehlich*, 2011 WL 13286700, at *1 (C.D. Cal. Feb. 25, 2011). In determining whether a claimant is disabled and thus entitled to benefits, the SSA applies the five-step sequential process articulated by 20 C.F.R. § 404.1520(a)(4), which involves asking whether:

> (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the [SSA] regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work.

*Winterroth v. Comm'r of Soc. Sec.*, 2021 WL 5639618, at *5 (S.D. Tex. Dec. 1, 2021) (citing *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995)).

In assessing the first step, a finding that the claimant is participating in substantial gainful activity—or work that involves significant physical or mental activities and is done for profit—precludes a finding of disability. 20 C.F.R. §§ 220.141, 404.1520(a)(4)(i).

If a claimant is not engaging in substantial gainful activity, the analysis proceeds to "step two," where it is determined whether the claimant has a medical impairment (or combination of impairments) that is "severe," such that the impairment significantly limits their physical or mental ability to do basic work activities. *Id.* §§ 220.102, 404.1520(a)(4)(ii). The impairment must have lasted or be expected to last for a continuous twelve-month period unless it is expected to result in death. *Id.* § 404.1509.

At the third step, a determination that an impairment is of sufficient duration and meets or exceeds an impairment listed in the applicable appendix necessitates a finding of disability, such that the claimant is entitled to benefits. *Id.* § 404.1520(a)(4)(iii).

If the third step is not satisfied, the analysis proceeds to "step four," where (i) the claimant's RFC is determined and (ii) it is assessed whether the claimant has the capacity to perform the requirements of any past relevant work. *Id.* § 404.1520(a)(4)(iv). The claimant's RFC refers to their ability to do physical and mental work activities on a regular and continuing basis despite any limitations from impairments. *See id.* § 220.120. A "regular and continuing basis" means eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). If their RFC allows the claimant to complete past relevant work, then they are not disabled. 20 C.F.R. § 404.1520(a)(4)(iv).

If a claimant cannot complete past relevant work, then the analysis proceeds to the fifth and final step, where it is determined whether the claimant is able to do any other work considering their RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If the claimant is unable to do so, then they are disabled. *Id.* If the claimant can do other work, they are not disabled. *Id.*

Although the claimant has the initial burden of proving disability, the burden shifts in the fifth and final step to the SSA to show that the claimant can perform work in the national economy. *See id.* § 404.1560(c)(2); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). To satisfy its burden, the SSA must produce expert vocational testimony or other similar evidence. *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986) (per curiam). The SSA solicits vocational expert testimony to assess the effect of any limitation on a given range of work and then opine whether the claimant's RFC permits them to perform substantial numbers of occupations within the range

of work at issue. *Conaway v. Astrue*, 2008 WL 4865549, at *4 (N.D. Tex. Nov. 10, 2008); *see* SSR 00-4P, 2000 WL 1898704, at *1-2 (Dec. 4, 2000).

More generally, in making disability determinations, the SSA considers opinions by medical sources, or licensed healthcare workers who work within the scope of their practice. *See* 20 C.F.R. §§ 404.1502(d), 404.1520c(a). Five factors are considered: (1) the supportability of the opinion; (2) the consistency of the opinion with evidence from other medical sources in the record; (3) the medical source's relationship with the claimant; (4) the medical source's specialization regarding pertinent medical issues; and (5) other factors that tend to support or contradict the opinion. *Id.* § 404.1520c(c). The most important of these factors are supportability and consistency, such that, pursuant to regulations applicable to claims filed on or after March 27, 2017, the SSA is required to explain its analysis regarding the same. *Id.* § 404.1520c(b)(2).

## B. Review of Non-Disability Determinations

A claimant may seek reconsideration of an initial finding of non-disability. *See* 42 U.S.C. § 1395ff(b)(1)(A). If the initial denial is upheld on reconsideration, a claimant may request a hearing before an ALJ, who will issue a written decision regarding the claimant's ostensible disability. *See* 20 C.F.R. § 404.1520a(e). A claimant can then request review of the ALJ's decision by the Social Security Appeals Council (the "Appeals Council"). *See id.* If the Appeals Council denies a request for review or otherwise upholds an unfavorable decision by an ALJ, the claimant can seek judicial review in an appropriate federal district court. *See* 42 U.S.C. § 1395ff(b)(1)(A).

## II. ADMINISTRATIVE PROCEDURAL HISTORY

In June 2020, Plaintiff filed applications for DIB and SSI, respectively, under Title II and Title XVI of the Social Security Act. (*See* Dkt. No. 7 at 5-10, 18-27; *see also* Dkt. No. 6-3 at 22). Through these applications, Plaintiff maintained that she was disabled since May 1, 2020 due to

various physical and mental impairments, including fibromyalgia, hypothyroidism, major depressive disorder, migraine headaches, generalized anxiety disorder, osteoarthritis, and post-traumatic stress disorder ("PTSD"). (*See* Dkt. No. 7 at 3, 11; Dkt. No. 7-1 at 7-13, 18).

On December 4, 2020, the SSA denied Plaintiff's applications based on a finding that she was not disabled. (Dkt. No. 6-5 at 53-56). Plaintiff requested a reconsideration of the denial, but the SSA upheld its initial decision. (*Id.* at 99-100; *see also* Dkt. No. 6-6 at 22-25). Plaintiff then requested a hearing before an ALJ. (*See* Dkt. No. 6-6 at 30-31).

A telephonic hearing before an ALJ was held on October 19, 2021. (Dkt. No. 6-4 at 7). During the hearing, Plaintiff, who was represented by counsel, testified regarding her ostensible disability. (*Id.* at 11-13). Dr. Diana Kizer, a vocational expert, testified regarding Plaintiff's ability to complete hypothetical tasks and perform related employment duties. (*Id.* at 13-17).

On October 27, 2021, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled. (Dkt. No. 6-3 at 22-36).

On June 22, 2022, the Appeals Council summarily denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (*See id.* at 2-4).

On or around August 18, 2022, having exhausted her administrative remedies, Plaintiff filed for judicial review of the final decision. *See Marroquin v. Kijakazi*, Civil Action No. 7:22-MC-0145 (S.D. Tex.), Dkt. No. 1-2.

### III. EVIDENTIARY RECORD

#### A. Medical Evidence

Plaintiff's treating physician, Dr. Bazan, completed a treating source statement dated February 3, 2020. (Dkt. No. 7-1 at 48-50). Dr. Bazan listed various diagnoses for which he provided treatment, including depression and fibromyalgia. (*Id.* at 48). For reference,

fibromyalgia is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least three months. SSR 12-2P, 2012 WL 3104869, at *2 (July 25, 2012) (quotations omitted). Based on these diagnoses, Dr. Bazan noted that Plaintiff was likely to be off task more than 25% of the workday, and that she could maintain attention/concentration for less than five minutes. (Dkt. No. 7-1 at 48). Estimating the number of days per month that Plaintiff would likely be absent from work, Dr. Bazan opined that "[s]he can't work at all." (Id.). In terms of functional capacity, Dr. Bazan opined that Plaintiff could frequently handle, finger, and feel bilaterally; rarely reach overhead and in all other directions bilaterally; and never push or pull bilaterally. (Id. at 49). According to Dr. Bazan, Plaintiff could never do the following: climb stairs, ramps, ladders, or scaffolds; balance, stoop, kneel, crouch, crawl; or rotate her head and neck. (Id. at 50).

Shortly thereafter, and upon referral from Dr. Bazan, Plaintiff made an in-office visit to Dr. Ruy Mireles, a neurologist, with a chief complaint of chronic headaches. (Dkt. No. 7-12 at 3-5). A neurological examination revealed that Plaintiff's motor, sensory, cerebellar, deep tendon reflexes, and gait were within normal limits. (Id. at 4). Nonetheless, due to her worsening headaches, Dr. Mireles recommended a change to Plaintiff's prescribed medications and ordered a magnetic resonance imagining ("MRI") scan of her brain. (Id. at 5).

On April 27, 2020, after the MRI, Plaintiff had a follow-up appointment with Dr. Mireles. (See id. at 6-9). While the MRI showed "no acute abnormalities," Dr. Mireles noted that Plaintiff "[was] still having her headaches despite the current treatment." (Id. at 8). Dr. Mireles recommended another change to Plaintiff's medication. (Id. at 9).

On May 27, 2020, Plaintiff had another follow-up for her chronic headaches. (See id. at 10-11). Dr. Mireles' diagnoses and neurological assessments remained unchanged. (Id.).

However, because Plaintiff reported that "she [was] not doing well" with the treatment plan, Dr. Mireles recommend yet another change to her medication regimen. (*Id.*).

On July 20, 2020, Dr. Bazan completed a visitation form for a telemedicine appointment with Plaintiff. (Dkt. No. 7-4 at 14). On the form, Dr. Bazan noted that Plaintiff reported "feeling better." (*Id.*). He further noted the prescription medications Plaintiff was taking in treating her various diagnoses. (*Id.*).

On September 1, 2020, Plaintiff saw Dr. Mireles again for her headaches. (Dkt. No. 7-12 at 12-13). Dr. Mireles noted that "[d]espite multiple preventive medicines, [there had been] no improvement of [Plaintiff's] condition[,]" although one medication, Zonisamide, "seem[ed] to be helping only a little." (*Id.* at 12). As a result, Dr. Mireles increased the dosage. (*Id.* at 12-13). He noted "[n]o other medical developments[,]" opining again that Plaintiff's motor, sensory, cerebellar, deep tendon reflexes, and gait were all within normal limits. (*Id.* at 12).

On October 27, 2020, Plaintiff presented to Dr. Mario Anzaldua for a consultative examination. (Dkt. No. 7-4 at 29-31). Dr. Anzaldua noted that Plaintiff had been diagnosed with fibromyalgia, hypothyroidism, joint pain, blurry vision, migraine headaches, and reflux esophagitis. (*Id.* at 29). Plaintiff reported back pain and arthritic pain most of the day, especially in her back and neck. (*Id.*). Plaintiff further reported that—

> she need[ed] assistance dressing from her daughter due to the pain. She report[ed] a pain level of 10 all day. She [could] sit for an hour, stand for about 30 minutes, and walk about half a block without any assistive devices. She [was] unable to do any house chores, mopping, sweeping, or garden work. She need[ed] assistance dressing from her daughter several times a week, especially to put on her lower garments. She [was] able to use her hands, write, and pick up a pencil but with moderately [sic] pain and discomfort. She can use a cell phone and write. She [reported] pain when she [got] in and out of a car.

(*Id.*). Plaintiff also reportedly experienced migraine headaches one to two times a week, which could last all day. (*Id.*). Dr. Anzaldua assessed Plaintiff's range of motion in her neck, back, legs,

arms, and hands, taking note of certain limitations and pain points. (*Id.* at 30-31). According to Dr. Anzaldua, Plaintiff exhibited: 5/5 strength in upper and lower extremities both proximally and distally; normal finger-to-nose test and rapid alternating movements; and normal non-antalgic gait. (*Id.* at 31). Dr. Anzaldua diagnosed Plaintiff with fibromyalgia, hypothyroidism, arthralgias, glaucoma, migraine headaches, reflux esophagitis, depression, and anxiety. (*Id.*).

On November 25, 2020, Dr. Charles Murphy, a state agency medical consultant, issued an RFC assessment upon a review of the medical records and determined that Plaintiff had the following limitations: occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in a workday, sit for about six hours in a workday, frequently crouch and stoop, and never climb ladders, ropes, or scaffolds. (Dkt. No. 6-5 at 34-36). Dr. Murphy further determined that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (*Id.* at 36). Dr. Murphy opined that Plaintiff's alleged limitations were "partially" supported by medical records. (*Id.*). He further opined that Plaintiff demonstrated the capability to perform medium work. (*Id.* at 38). For reference, medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c).

On January 6, 2021, Plaintiff had another follow-up with Dr. Mireles. (Dkt. No. 7-12 at 14-15). This time, Dr. Mireles noted that Plaintiff's migraine headaches "seem[ed] to be stable" and that her prescribed migraine medication "seem[ed] to be doing well." (*Id.* at 14). According to Dr. Mireles' examination, Plaintiff's motor, sensory, cerebellar, deep tendon reflexes, and gait continued to be within normal limits. (*Id.*).

On March 25, 2021, Dr. Amita Hedge, another state agency medical consultant, issued an RFC assessment upon her own review of the medical records and determined that Plaintiff had the

following limitations: occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in a workday, sit for about six hours in a workday, frequently crouch and stoop, and never climb ladders, ropes, or scaffolds. (Dkt. No. 6-5 at 68-71). Dr. Hedge noted that, although Dr. Bazan's July 2020 exam was "not detailed," he otherwise "report[ed] [Plaintiff] feeling better[.]" (*Id.* at 70; *see also* Dkt. No. 7-4 at 14). Based on the evidence, Dr. Hedge determined that Plaintiff's "alleged severity and limiting effects from [her] impairments [were] not wholly supported[.]" (Dkt. No. 6-5 at 70). Like Dr. Murphy, Dr. Hedge opined that, despite her limitations, Plaintiff could perform medium work. (*Id.* at 76).

On May 6, 2021, Plaintiff had another follow-up with Dr. Mireles, whose diagnosis of migraines and neurological assessments remained unchanged. (*See* Dkt. No. 7-12 at 16-17).

On September 16, 2021, Dr. Bazan completed a medical opinion form regarding Plaintiff's conditions. (Dkt. No. 7-11 at 35-38). He diagnosed Plaintiff with depression, fibromyalgia, and migraine headaches. (*Id.* at 35). Dr. Bazan noted that Plaintiff would likely be off task more than 25% of the workday and that she could maintain attention for less than five minutes. (*Id.*). He again opined that Plaintiff "can't work at all" due to her impairments. (*Id.*). According to Dr. Bazan, Plaintiff could rarely lift or carry less than ten pounds and could never lift or carry more than ten pounds because "[she] has pain all over [her] body[.]" (*Id.* at 36). He also determined that Plaintiff had occasional foot control limitations and required a walker. (*Id.* at 37).

Plaintiff also visited a Dr. Hildebrando Salinas for treatment of her mental impairments during the relevant period. (*See, e.g.*, Dkt. No. 7-8 at 10-13; Dkt. No. 7-9 at 2-12; Dkt. No. 7-10 at 6-22).[1]

---

[1] The medical evidence for those visits will not be discussed in detail because Plaintiff does not challenge the ALJ's findings related to her mental impairments.

**B. Hearing Testimony**

At the hearing before the ALJ, Plaintiff claimed to have become disabled in May 2020 and that she suffered from depression, migraines, and fibromyalgia. (Dkt. No. 6-4 at 11). As to her fibromyalgia, Plaintiff testified that she experienced pain "[f]rom [her] neck down to [her] shoulders, arms, and hands, next all over [her] body." (*Id.* at 12). Depending on the extent of the pain, Plaintiff testified that she was unable to walk up to 20 days in a typical month. (*See id.*). According to Plaintiff, the heaviest thing that she could lift and carry was a bottle of water. (*Id.*). She testified that, about two to four times a week, she experienced day-long migraine headaches that caused a sensitivity to light and smell. (*Id.* at 12-13).

Vocational expert, Dr. Kizer, testified that a hypothetical person of Plaintiff's age, education, and work experience could not perform Plaintiff's past relevant work. (*Id.* at 15-16). She determined that the hypothetical person could perform light, unskilled work. (*See id.* at 16-17). As examples of such jobs, Dr. Kizer offered a domestic laundry worker, a housekeeping cleaner, and a collator operator. (*Id.* at 16).

## IV. DETERMINATION BY THE ALJ

In applying the first two steps of the sequential process described above, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since May 1, 2020, and that Plaintiff suffered from severe impairments, including fibromyalgia, obesity, migraine headaches, depression, anxiety, and PTSD. (Dkt. No. 6-3 at 25-26).

Moving to step three, the ALJ determined that Plaintiff's impairments did not meet or exceed the severity of those listed in the applicable appendix. (*Id.* at 26-28).

The ALJ moved to step four and determined that Plaintiff had the RFC to perform light work, except that she was—

limited to no ladders, ropes, or scaffolds; frequent ramps or stairs; frequent balancing; frequent stooping; frequent kneeling; frequent crouching; frequent crawling; frequent exposure to loud noise; and frequent use of moving mechanical parts and exposure to unprotected heights. [Plaintiff] [was] limited to simple and repetitive tasks in a routine work setting, performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and infrequent and gradual workplace changes, frequent interaction with the public, and frequent interaction with coworkers and supervisors.

(*Id.* at 28-29). For purposes of the SSA, "light work" means "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). While "the weight lifted may be very little," light work "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

In determining that Plaintiff could perform such light work, the ALJ considered the hearing testimony, Plaintiff's medical records, and the opinions of the state agency medical consultants. (*See* Dkt. No. 6-3 at 29-33). The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (*Id.* at 29).

According to the ALJ, Plaintiff's "longitudinal medical history and mental status examinations[ ] generally show[ed] that [Plaintiff's] symptoms related to her mental impairments were well-managed with conservative treatment and that she [could] sustain a greater [RFC] than alleged." (*Id.* at 31). Nevertheless, the ALJ concluded that Plaintiff's depression, anxiety, and PTSD limited her to "simple and repetitive tasks in a routine work setting, performed in a work environment free of fast-paced production requirements[.]" (*Id.*).

The ALJ also found that Plaintiff "received primarily conservative treatment for her physical impairments during the relevant period, predominantly medications, and [did] not support

a finding that her symptoms have translated into functional limitations to the extent alleged." (*Id.* at 30). The ALJ thus concluded that "[Plaintiff's] fibromyalgia limit[ed] her to the performance of light work" subject to the mentioned limitations. (*Id.*).

When assessing Plaintiff's physical impairments, the ALJ deemed the medical consultants' opinions to be persuasive, explaining that they were "consistent with each other and generally consistent with the objective medical evidence, and lack thereof, including physical examinations consistently showing intact strength and a normal gait[,] and [Plaintiff's] longitudinal treatment history . . . ." (*See id.* at 32). But upon considering the evidence in the light most favorable to Plaintiff, including the abnormal findings from the consultative examinations, Plaintiff's testimony and statements, and the third-party statements of her daughter, the ALJ determined that "the evidence [could] support somewhat greater exertional and nonexertional limitations than opined [by the medical consultants] . . . ." (*Id.*).

As for the opinion of treating physician Dr. Bazan, the ALJ found it unpersuasive, noting that while Dr. Bazan had the benefit of in-person examinations, "his opinion [was] not supported by his treatment notes nor [was] it consistent with the objective medical evidence as a whole, including [the] mostly unremarkable physical examinations, the consultative examination, and [Plaintiff's] longitudinal treatment history[,]" as well as "the opinions of the state agency medical consultants[.]" (*Id.*). For example, Plaintiff's physical examinations consistently indicated that she exhibited normal strength and a normal gait, which contradicted the exertional limitations noted by Dr. Bazan. (*Id.*). As the ALJ further highlighted—

> Dr. Bazan indicated [that Plaintiff] requires a walker, however the record lacks evidence establishing she was prescribed a walker, or any other hand-held assistive device, and describing the circumstances for which it is needed. Additionally physical examinations consistently indicate [that Plaintiff] exhibited a normal gait.

(*Id.* (internal citations omitted)). Accordingly, the ALJ did not allot a limitation to account for the use of a walker in the RFC analysis. (*Id.*). The ALJ also deemed Dr. Bazan's opinion of February 3, 2020 to be unpersuasive insofar as it predated the alleged disability onset date. (*Id.* at 33). The ALJ instead relied upon "opinions based on more recent objective medical evidence, including those of the state agency [medical] consultants[,]" which he deemed "more useful in determining [Plaintiff's] functional capacity during the relevant period." (*Id.*).

Ultimately, the ALJ concluded that the RFC finding of reduced light work was supported by the objective medical findings and other evidence and that, under step four, Plaintiff's RFC preluded her from performing any past relevant work. (*Id.* at 33-34).

The ALJ then assessed, under step five, whether Plaintiff could complete work-related tasks for any occupations for which there are a substantial number of jobs in the national economy. (*Id.* at 34-36). The ALJ determined that Plaintiff could perform tasks required of domestic laundry workers, housekeeping cleaners, and collator operators, with each occupation existing in significant numbers in the national economy. (*Id.* at 34). Accordingly, the ALJ concluded that Plaintiff was not disabled and denied her applications for benefits. (*Id.* at 36).

## V. STANDARD OF REVIEW

Summary judgment is a proper mechanism for seeking judicial review of the Commissioner's final decision. *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214-15 (5th Cir. 1996) (per curiam). Pursuant to 42 U.S.C. § 405(g), judicial review of the Commissioner's decision is limited to two inquiries: (1) whether substantial evidence supports the final decision and (2) whether the Commissioner used the proper legal standards to evaluate the evidence. *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016) (per curiam).

Substantial evidence is "more than a mere scintilla" or "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002) ("Substantial evidence 'is more than a mere scintilla and less than a preponderance.'" (quoting *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000))). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (per curiam) (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (per curiam)). Courts are to scrutinize the record to determine whether there is substantial evidence but may not reweigh the evidence nor substitute their judgment for the Commissioner's, even if they believe that the evidence weighs against the Commissioner's decision. *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018) (quoting *Masterson*, 309 F.3d at 272) (quotations omitted). "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). If the Commissioner's findings are supported by substantial evidence, then they are conclusive, and the decision must be affirmed. *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam).

For purposes of whether the proper legal standards were applied, an agency's actions are assessed based on the statutes and regulations in effect at the time of the relevant activity. *Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016).

## VI. ANALYSIS

Plaintiff claims that the ALJ's RFC determination is not supported by substantial evidence. In Plaintiff's view, the ALJ failed to properly evaluate Dr. Bazan's opinion in accordance with relevant regulations. (Dkt. No. 12 at 8-14). More specifically, Plaintiff argues that the ALJ failed to adequately explain how Dr. Bazan's medical opinion lacked consistency with the medical

record. (*Id.* at 10-14; Dkt. No. 16 at 3). Because fibromyalgia often lacks objective evidence, Plaintiff notes, the ALJ must do more than simply state that a treating physician's medical opinion is not "consistent with the objective medical evidence as a whole." (Dkt. No. 12 at 10-11). Plaintiff takes the position instead that Dr. Bazan's opinion was in fact consistent with the medical evidence, including Dr. Anzaldua's consultative examination. (*Id.* at 11-12). The Commissioner responds that the ALJ's analysis reveals a thorough consideration of the medical evidence and an appropriate assessment of Plaintiff's impairments. (Dkt. No. 15 at 5).

As detailed above, Dr. Bazan opined that Plaintiff (i) could never lift more than ten pounds and rarely lift less than ten pounds, (ii) could only stand or sit for less than an hour in a workday, (iii) would likely be off task more than 25% of the workday, (iv) could maintain attention or concentration for less than five minutes, and (v) sometimes required a walker. (Dkt. No. 7-11 at 35-38). In rejecting this RFC determination, the ALJ stated that—

> [a]lthough Dr. Bazan had the benefit of in-person examinations . . . , his opinion is not supported by his treatment notes nor is it consistent with the objective medical evidence as a whole, including mostly unremarkable physical examinations, the consultative examination, and [Plaintiff's] longitudinal treatment history.

(Dkt. No. 6-3 at 32 (internal citations omitted)).

For reference, "consistency" concerns a medical opinion's coherence with other evidence in the record, whereas "supportability" refers to whether and to what degree relevant medical evidence supports a medical opinion. *See* 20 C.F.R. § 404.1520c(c)(1), (2). Under governing regulations,[2] the SSA is required to discuss both a medical opinion's consistency and supportability. *See id.* § 404.1520c(b)(2). Indeed, "[a]n ALJ must articulate how [they] considered the supportability and consistency factors for a medical opinion . . . in [their] determination."

---

[2] Because Plaintiff's applications were filed after March 27, 2017, they are governed by revised regulations that redefine how medical evidence is categorized and evaluated for purposes of an RFC assessment. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a).

*William T. v. Comm'r of Soc. Sec.*, 2020 WL 6946517, at *3 (N.D. Tex. Nov. 25, 2020). Although an ALJ is not required "to follow formalistic rules when articulating the reasons[,]" the decision should contain a sufficient development of the record and explanations of findings to permit meaningful review. *Undheim v. Barnhart*, 214 F. App'x 448, 450-51 (5th Cir. 2007) (per curiam); *see also Luckett v. Kijakazi*, 2021 WL 5545233, at *4 (S.D. Tex. Nov. 26, 2021).

Here, the ALJ adequately explained why Dr. Bazan's opinion was neither supported by his own treatment notes nor consistent with other medical sources. (*See* Dkt. No. 6-3 at 32-33).

To begin, the ALJ noted that, although Dr. Bazan had the benefit of examining Plaintiff in person, Dr. Bazan's treatment notes simply did not support the exertional limitations he attributed to Plaintiff. As an example, the ALJ pointed to Dr. Bazan's opinion that Plaintiff required a walker. (*See id.* at 32). The ALJ explained that there was no record evidence demonstrating that Dr. Bazan—or any other medical provider for that matter—actually prescribed the use of a walker, nor did Dr. Bazan's treatment notes describe the circumstances in which a walker was needed.[3] (*See id.*). Indeed, it is not improper for an ALJ to assign little weight to a treating physician's treatment notes for the lack of explanation or supporting objective tests. *See Foster v. Astrue*, 410 F. App'x 831, 832-33 (5th Cir. 2011) (per curiam); *see also Webster v. Kijakazi*, 19 F.4th 715, 718-19 (5th Cir. 2021) (recognizing that the revised SSA regulations provide that the opinions of treating physicians are no longer entitled to controlling weight).

The ALJ also adequately explained why Dr. Bazan's opinion was not consistent with the objective medical evidence as a whole.[4] With respect to the RFC assessment, the ALJ conducted

---

[3] Moreover, at the hearing, Plaintiff did not mention any necessary use of a walker or other hand-held assistive device to ambulate. Nor did Plaintiff's counsel bring this to the attention of the ALJ or the vocational expert during the statements to the court and questioning of the vocational expert.

[4] Plaintiff cites to *Bragg v. Commissioner of Social Security Administration*, 567 F. Supp. 2d 893 (N.D. Tex. 2008) for the proposition that, in cases involving a fibromyalgia diagnosis, "an allegation of an absence

an extensive review of the medical evidence and identified physical examination findings that supported a reduced light work RFC.[5]  (*See* Dkt. No. 6-3 at 29-32).  For instance, the ALJ specifically pointed to Plaintiff's unremarkable physical exams and her longitudinal treatment history. (*See id.* at 30-32).  The ALJ highlighted, for example, that although Dr. Anzaldua took note of Plaintiff's reduced range of motion of the neck and lumbosacral spine and various other limitations, Dr. Anzaldua "also indicated [that Plaintiff] exhibited a normal, non-antalgic gait [and] 5/5 strength in [her] upper and lower extremities[.]"  (*Id.* at 30, 32).  As the ALJ explained, Plaintiff's physical examinations consistently "reflect[ed] mostly unremarkable findings during the relevant period, indicating [that Plaintiff's] motor, sensory, cerebellar, deep tendon reflexes, and gait were within normal limits . . . ."  (*Id.* at 30).  The ALJ further explained that—

> the nature and scope of [Plaintiff's] treatment for her physical impairments [did] not support a finding that she was precluded from performing less than the full range of light work with the limitations described in the [RFC].  Specifically, the record demonstrate[d] [that Plaintiff] received mostly conservative treatment for her physical impairments, including prescription medication, . . . and that this treatment was generally effective.

(*Id.* (internal citations omitted)).

While Plaintiff may argue that Dr. Bazan's opinion was consistent with Dr. Anzaldua's diagnoses (Dkt. No. 12 at 11-12), the ALJ specifically noted that Dr. Anzaldua did not go so far as to assess Plaintiff's resulting RFC (Dkt. No. 6-3 at 32).

---

of objective clinical findings does not alone constitute good cause to reject opinions of treating physicians." (Dkt. No. 12 at 11 (citing *Bragg*, 567 F. Supp. 2d at 912)).  The *Bragg* case, however, is clearly distinguishable insofar as it was decided under prior regulatory authority—inapplicable here—that gave controlling weight to the opinions of treating physicians.  *See Earley v. Comm'r of Soc. Sec. Admin.*, 2023 WL 2940248, at *9 n.1, 12 (E.D. Tex. Feb. 23, 2023) (rejecting the claimant's reliance on cases like *Bragg* and concluding that the ALJ's determination of the objective medical evidence was properly supported by substantial evidence), *report and recommendation adopted*, 2023 WL 2644079 (E.D. Tex. Mar. 27, 2023).

[5] Objective medical evidence such as longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing the severity of the impairment associated with fibromyalgia. SSR 12-2P, 2012 WL 3104869, at *3 (July 25, 2012).

Plaintiff also complains that the ALJ failed to explain how Dr. Bazan's opinion was inconsistent with the medical consultants' opinions that Plaintiff could perform medium work, contending that the ALJ did not find this particular aspect of the consultants' opinions to be consistent with the record. (Dkt. No. 12 at 12-13).   Contrary to Plaintiff's contention, the ALJ deemed that the medical consultants' opinions were "consistent with each other and *generally* consistent with objective medical evidence, and [the] lack thereof[.]"   (Dkt. No. 6-3 at 32 (emphasis added)).   Otherwise, upon considering the evidence in the light most favorable to Plaintiff, the ALJ concluded that the evidence supported imposing greater limitations than those opined by the consultants. (*Id.*).   An ALJ is entitled to determine the credibility and weight of the medical sources, *see Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995), and while the ALJ may be somewhat limited in making "drastic" departures from the medical opinions, their RFC determinations need not "perfectly match" those of the medical sources, *see Cooley v. Comm'r of Soc. Sec.*, 587 F. Supp. 3d 489, 497-98 (S.D. Miss. 2021) (collecting cases).

For these reasons, the Magistrate Judge concludes that the ALJ's RFC determination should be affirmed.

## VII. CONCLUSION

The Magistrate Judge RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. No. 11) be DENIED, that the Commissioner's Motion for Summary Judgment (Dkt. No. 14) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

### *Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations. 28 U.S.C. § 636(b)(1)(C); Fed.

R. Civ. P. 72(b).  Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the district court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the district court, except on grounds of clear error or manifest injustice.

DONE at McAllen, Texas this 17th day of August 2023.

J. SCOTT HACKER
United States Magistrate Judge